EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Bonnie Savary Leguillow et al.<br><br>    Apeladas<br><br>            v.<br><br>Municipio de Fajardo; Integrand Assurance Company<br><br>    Apelantes | 2017 TSPR 163<br><br>198 _____ |
|---|---|

Número del Caso: AC-2016-33

Fecha: 18 de agosto de 2017

Tribunal de Apelaciones:  Región Judicial de Carolina y Fajardo, Panel VIII

Abogada de los apelantes:

    Lcda. Guelmarie Aguila Meléndez

Abogado de los apelados:

    Lcdo. Javier Rotger Martino

Materia: Derecho de Seguros - Una aseguradora contratada como Tercero Administrador de un Programa de Responsabilidad Pública de los Municipios no responde por los daños y perjuicios sufridos por un peatón a causa de una caída ocasionada por el desnivel de una tapa de acero que se encontraba en la acera por la cual transitaba.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Bonnie Savary Leguillow *et al.*

    Apeladas

      v.                         AC-2016-0033      Apelación

Municipio de Fajardo;
Integrand Assurance Company

    Apelantes

Opinión del Tribunal emitida por el Juez Asociado SEÑOR FELIBERTI CINTRÓN

En San Juan, Puerto Rico, a 18 de agosto de 2017.

En este recurso se plantea si Integrand Assurance Company (Integrand o apelante), en calidad de Tercero Administrador de un Programa de Responsabilidad Pública de los Municipios de Puerto Rico (Programa), le responde **directamente** a una persona que ha sufrido daños y perjuicios como consecuencia de la alegada negligencia de un municipio. Luego de examinar detenidamente los sucesos pertinentes, a la luz del derecho aplicable, resolvemos que no procede tal reclamación.

## I. TRASFONDO

A continuación resumimos los hechos relevantes a la controversia, así como el trámite

correspondiente a la causa de acción que sirvió de base al asunto que nos ocupa.

El Área de Servicios Públicos del Departamento de Hacienda e Integrand suscribieron un acuerdo denominado *Municipalities of Puerto Rico Deposit Accounted Liability Policy-Contract* (**Contrato**) a favor de los municipios de Puerto Rico, con vigencia de un (1) año a partir del 30 de junio de 2010.

El 27 de agosto de 2012, la Sra. Bonnie Savary Leguillow (señora Savary), conjuntamente con su hija y su madre (apeladas), presentaron una Demanda contra el Municipio de Fajardo (Municipio) y varios codemandados, algunos de ellos desconocidos. Como parte de su reclamación, las apeladas solicitaron el pago de los daños sufridos como consecuencia de una caída de la señora Savary que tuvo lugar el 29 de abril de 2011. El aludido accidente ocurrió mientras la señora Savary discurría por una acera del Municipio, a causa del desnivel de una tapa de acero que se encontraba a su paso.[1]

El 6 de septiembre de 2013, el Municipio sometió una *Moción de Sentencia Sumaria* mediante la cual solicitó la desestimación de la Demanda por incumplir con el requisito de notificación previa, fijado en el Art. 15.003 de la Ley de Municipios Autónomos del Estado Libre Asociado de

---

[1] Se incluyeron como demandados a las siguientes entidades: Municipio de Fajardo, Autoridad de Acueductos y Alcantarillados, Compañía de Seguro Acosta Adjustment, Inc., Compañía de Seguros Triple S y Compañía de Seguros X,Y,Z, en calidad de compañías de seguros desconocidas que, al momento de los hechos, tenían pólizas de seguros vigentes a favor de los demandados y respondían por los daños y perjuicios reclamados.

Puerto Rico de 1991 (Ley de Municipios Autónomos), 21 LPRA sec. 4703 (2014).

El 22 de octubre de 2013 se presentó una Demanda Enmendada con el propósito de añadir a la Autoridad de Energía Eléctrica (AEE) como parte demandada por alegadamente ser la propietaria de la aludida tapa de acero. En el documento se incluyeron además, como parte demandada, a aseguradoras desconocidas que, a la fecha de los eventos, tenían pólizas de seguros vigentes a favor de la AEE.

El 5 de marzo de 2014, la parte apelada presentó una *Moción Solicitando Autorización para Emplazar*. Por este medio, pidió incluir a Integrand en el pleito en sustitución de una de las aseguradoras demandadas desconocidas, alegando que la apelante respondía directamente por los daños ocasionados por el Municipio.

Luego de una serie de trámites procesales, el 12 de marzo de 2014, Integrand, sin someterse a la jurisdicción del tribunal, compareció en calidad de administradora del Programa y presentó una *Comparecencia Especial, Moción Urgente e Informativa en Cuanto a Estatus del Fondo*. Allí explicó que, al 7 de marzo de 2014, únicamente quedaban disponibles $35,510.00 de los fondos del Programa administrado por Integrand destinados para el pago de las reclamaciones contra los municipios de Puerto Rico por eventos ocurridos entre el 30 de junio de 2010 y el 30 de junio de 2011, es decir, durante la vigencia del Contrato.

El 2 de abril de 2014, el Tribunal de Primera Instancia autorizó la sustitución y el emplazamiento de Integrand. El 8 de mayo de 2014, se emplazó a la apelante con copia de la Demanda Enmendada.

El 17 de julio de 2014, Integrand presentó una *Moción de Sentencia Sumaria*. Solicitó la desestimación de la acción directa instada en su contra en calidad de aseguradora del Municipio, según provisto en el Art. 20.030 del Código de Seguros de Puerto Rico (Código de Seguros), 26 LPRA sec. 2003 (2014). Argumentó no ser aseguradora del Municipio, sino meramente una administradora del Programa. Entre otros documentos, Integrand incluyó una carta suscrita por el Comisionado de Seguros de Puerto Rico, quien certificó que el Contrato no era uno de seguro sino que, a través del acuerdo, se pactaron únicamente los servicios de administración de un programa de autoseguro.

Así las cosas, el Tribunal de Primera Instancia dictó una Sentencia Sumaria Parcial declarando con lugar ambas mociones y desestimando de esta forma las reclamaciones instadas, tanto en contra del Municipio, como de Integrand. En lo atinente a Integrand, el foro primario concluyó que la apelante no era aseguradora del Municipio. Dispuso que, conforme a los términos del Contrato, no hubo una transferencia de riesgo y las funciones de la apelante se limitaron exclusivamente a las de un Tercero Administrador de un programa de autoseguro.

La parte apelada recurrió entonces al Tribunal de Apelaciones. En lo concerniente a este recurso, dicho foro dejó sin efecto la desestimación de la reclamación en contra de Integrand.

El foro apelativo intermedio examinó la normativa prevaleciente en otras jurisdicciones debido a la ausencia de alguna disposición específica que regule el autoseguro para efectos de la Ley de Municipios Autónomos. En atención a ello, citó legislación y jurisprudencia de varios estados de los Estados Unidos en donde se atendió la interrogante de si, bajo ciertas circunstancias, un autoseguro puede tratarse como un seguro para efectos legales.

Dictaminó que, contrario a lo aducido por Integrand, las cláusulas del Contrato eran confusas y no fijaban con precisión el rol y las responsabilidades de la apelante ante una reclamación. Señaló que, las disposiciones del acuerdo se asemejan más bien a las de una póliza de seguro. En particular, destacó que el documento: se titula *Policy-Contract*, hace referencia al pago de una "prima" y dispone para una participación activa de Integrand en la tramitación de las reclamaciones.

De otra parte, mencionó que el Tribunal de Primera Instancia no precisó el derecho aplicable a la figura de Tercero Administrador en el contexto de la reclamación en contra de Integrand para, de este modo, fundamentar la desestimación decretada. Indicó que, a diferencia de

varias jurisdicciones de los Estados Unidos, en Puerto Rico la figura del Tercero Administrador se ha reglamentado exclusivamente en el campo de los servicios de salud. Explicó que, el único intento de regular esta práctica localmente, a través de una enmienda al Código de Seguros, resultó infructuoso. Por lo tanto, localmente existe un vacío legal sobre este particular.

Así pues, resolvió que mediaban consideraciones de alto interés público que requerían devolver el caso al foro primario para que Integrand presentara prueba sobre la intención detrás del acuerdo, así como el alcance de sus cláusulas, para de esta forma poder determinar si la apelante actuó como Tercero Administrador o si, por el contrario, debía responder **directamente** a la parte apelada en calidad de aseguradora.

Inconforme, Integrand acudió a este Foro. El 24 de junio de 2016 acogimos su recurso de apelación. Como único error, debemos resolver si procedía dictar sentencia sumaria desestimando la acción presentada en contra de Integrand. Veamos.

## II. EL CONTRATO

Las siguientes particularidades, relevantes a la disposición de la controversia planteada en este caso, surgen del Contrato suscrito por la apelante.

En el Contrato, Integrand se obligó a investigar, defender y transigir cualquier reclamación en daños

interpuesta en contra de los municipios.[2] Por su parte, el Gobierno, a través del Departamento de Hacienda, se comprometió a crear un fondo de $18 millones (*Funding Amount*), de los cuales $14.4 millones serían destinados para el pago de las reclamaciones en contra de los municipios y $3.6 millones para sufragar los gastos de Integrand en investigar, defender y transigir reclamaciones cubiertas bajo los términos y condiciones del Contrato. A tono con lo pactado, el Gobierno debía desembolsar los $18 millones no más tarde del 10 de septiembre de 2010. De lo contrario, la apelante tendría el derecho a rescindir el Contrato. Asimismo, se establecieron los términos para calcular el reembolso de cualquier sobrante del fondo en la eventualidad de cancelarse el Contrato o al terminar su vigencia.

Igualmente resulta importante mencionar que, se dispuso en el Contrato que la responsabilidad de Integrand cesaría una vez se agotase el fondo de $14.4 millones asignado para cubrir las reclamaciones contra los municipios. De ocurrir esa eventualidad, la responsabilidad de pagar las reclamaciones revertiría al Gobierno. (Contrato Sec. D1d, **Ap. 152**). Además, se insertó una cláusula de relevo (*Hold Harmless and Indemnification*), aplicable, entre otras causas, a

---

[2] "INTEGRAND Assurance Company shall investigate, defend and settle any covered claim or 'suit' against any or all of the insureds, jointly or severally, seeking damages". *Municipalities of Puerto Rico Deposit Accounted Liability Policy-Contract*, *Liability Coverages* (**Ap. 154**).

reclamaciones iniciadas contra Integrand por daños en exceso de los límites del fondo de $14.4 millones. (Contrato Sec. Fb, **Ap. 152**).

## III. DERECHO APLICABLE

### A. Ley de Municipios Autónomos

El Art. 8.011 de la Ley de Municipios Autónomos, 21 LPRA sec. 4361 (2014), le exige a los municipios proteger sus activos y recursos de "riesgos puros". En este contexto, el término "riesgos puros" incluye reclamaciones por daños y perjuicios. Art. 8.011(c)(3) de la Ley de Municipios Autónomos, 21 LPRA sec. 4361(c)(3) (2014). Para poder cumplir con este deber, los municipios han de valerse de aquellos mecanismos fijados por el Secretario de Hacienda para manejar riesgos. Art. 8.011(a) de la Ley de Municipios Autónomos, 21 LPRA sec. 4361(a) (2014).

De esta manera, la responsabilidad de negociar y tramitar los regímenes necesarios para salvaguardar a los municipios de estas contingencias ha sido delegada al Secretario de Hacienda. A esos efectos, el Art. 12.020(3) del Código de Seguros, 26 LPRA sec. 1201(3) (2014), dispone: "[e]xcepto en aquellos casos en que por ley se disponga de otro modo, el Secretario de Hacienda gestionará y contratará los seguros del Estado Libre Asociado y sus **municipios**". (Énfasis nuestro). Estas competencias amplias, según encomendadas al Secretario de Hacienda, se detallan del modo siguiente:

El Secretario de Hacienda actuará en **representación** de los municipios, en la forma que

estime más conveniente, económica y ventajosa para éstos, en todo lo relacionado con la protección de sus activos contra pérdidas resultantes de los riesgos puros. En el desempeño de esta responsabilidad, el Secretario estará facultado, entre otras cosas, para decidir el mecanismo que se utilizará para tratar los riesgos a cubrir, los límites de la cobertura, los términos contractuales que aplicarán a la misma y la aportación, cuota o prima que habrá de pagar el municipio por la cobertura que habrá de recibir y los procedimientos a seguir en el trámite, ajuste y negociación de las reclamaciones. (Énfasis nuestro). Art. 8.011(d) de la Ley de Municipios Autónomos, 21 LPRA sec. 4361(d) (2014).

Asimismo, el estatuto reconoce expresamente la autoridad del Departamento de Hacienda de optar por utilizar el mecanismo del autoseguro al ejercitar su cometido. De modo que, se faculta "[e]l uso de autoseguros que cumplan con la técnica del seguro pero que **no se considerarán como seguros** al amparo de[l] […] Código de Seguros de Puerto Rico[]". (Énfasis nuestro). Art. 8.011(a)(1) de la Ley de Municipios Autónomos, 21 LPRA sec. 4361(a)(1) (2014).

**B. El Seguro**

El seguro constituye un acuerdo donde una parte se compromete a compensar a otra por una pérdida ocasionada a causa de una contingencia en particular. El Art. 1.020 del Código de Seguros, 26 LPRA sec. 102 (2014), lo define como aquel "contrato mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo".

Es decir, a cambio del pago de una prima, se transfiere el riesgo de un evento específico a la aseguradora, quien viene obligada a cubrir los daños económicos por los que el asegurado esté llamado a responder. Viruet *et al.* v. SLG Casiano-Reyes, 194 DPR 271 (2015); Natal Cruz v. Santiago Negrón *et al.*, 188 DPR 564 (2013); Maderas Tratadas v. Sun Alliance *et al.*, 185 DPR 880 (2012); Integrand Assurance v. CODECO *et al.*, 185 DPR 146 (2012). Así pues, la función primordial de una póliza de seguro es establecer un mecanismo para transferir un riesgo y de esta manera proteger al asegurado de ciertos eventos identificados en el contrato de seguro. R.J. Reynolds Tobacco (CI), Co. v. Vega Otero, Inc. *et al.*, 2017 TSPR 43, 197 DPR ___ (2017); R.A. Goode, *Note*, *Self-Insurance as Insurance in Liability Policy "Other Insurance" Provisions*, 56 Wash. & Lee L. Rev. 1245, 1252 (1999).

De otra parte, nuestro ordenamiento en materia de seguros, le permite a un perjudicado iniciar una acción directamente contra una aseguradora con el propósito de reclamar el pago de aquellos daños y perjuicios ocasionados por su asegurado.[3] Esta acción se caracteriza por ser

---

[3]    A esos efectos, el Art. 20.010 del Código de Seguros de Puerto Rico (Código de Seguros), 26 LPRA sec. 2001 (2014) dispone:

    "El asegurador que expidiere una póliza asegurando a una persona contra daños y perjuicios, por causa de responsabilidad legal por lesiones corporales, muerte o daños a la propiedad de una tercera persona, será responsable cuando ocurriere una pérdida cubierta por dicha póliza, y el pago de dicha pérdida por el asegurador hasta el grado de su responsabilidad por la misma, con arreglo a la póliza, no dependerá del pago que efectúe el asegurado en virtud de sentencia firme dictada contra él con motivo del suceso, ni dependerá de dicha sentencia".

"independiente, distinta y separada" de la reclamación que tiene disponible el promovente en contra del causante de sus daños. Ruiz v. New York Dept. Stores, 146 DPR 353, 364 (1998). Véase, además, Albert Rodríguez v. Integrand Assurance Company, 2016 TSPR 195, 196 DPR ___ (2016).

A pesar de ser una acción separada, una persona que reclama daños por la alegada negligencia de un asegurado tiene tres (3) opciones para hacer valer su derecho: (1) demandar al asegurador; (2) demandar al asegurado, o (3) demandar a ambos conjuntamente. Albert Rodríguez v. Integrand Assurance Company, supra; Neptune Packing Corp. v. Wackenhut Corp., 129 DPR 283 (1988). Claro está, la responsabilidad del asegurador estará limitada por las cláusulas y restricciones delineadas en la póliza bajo la cual se demanda.[4] Albert Rodríguez v. Integrand Assurance Company, supra.

### C. El Autoseguro

El término autoseguro no tiene una acepción legal precisa. E. Hollowell, Annotation, *Self-insurance against Liability as other Insurance within Meaning of Liability Insurance Policy*, 46 ALR4th 707, 710 Sec. 2[a] (1986). Con

---

[4]     Así lo dispone específicamente el Art. 20.030 del Código de Seguros, 26 LPRA sec. 2003(1) (2014):

"(1) La persona que sufriere los daños y perjuicios tendrá, a su opción, una acción directa contra el asegurador conforme a los términos y limitaciones de la póliza, acción que podrá ejercitar contra el asegurador solamente o contra éste y el asegurado conjuntamente […]. La responsabilidad del asegurador no excederá de aquella dispuesta en la póliza […]. Cualquier acción incoada conforme a esta sección estará sujeta a las condiciones de la póliza o contrato y a las defensas que pudieran alegarse por el asegurador en acción directa instada por el asegurado […]".

el fin de examinar su significado, comenzamos por transcribir la siguiente definición:

> Situación en la que una persona, física o jurídica, soporta con su patrimonio las consecuencias económicas derivadas de sus propios riesgos, sin intervención de ninguna entidad aseguradora. J. Castelo Maltrán, *Diccionario MAPFRE de Seguros*, Madrid, Ed. MAPFRE S.A., 1988, pág. 26.

Igualmente, se ha descrito el autoseguro como un concepto amplio y relativamente amorfo utilizado inconsistentemente para describir una entidad que carece, parcial o totalmente, de un seguro comercial o que de alguna manera retiene parte de su propio riesgo. J.B. Berkely, *Recent Developments in Self-insurance Law*, 33 Tort & Ins. L.J. 693-694 (1998). Véase, además, Goode, *supra*, pág. 1250. De manera que, en cierto sentido, todo riesgo que no esté asegurado adviene autoasegurado. 1-A *Couch on Insurance 3d* Sec. 10.1, pág. 10-3 (2010).

A diferencia del seguro, el autoseguro se distingue porque no se le transfiere el riesgo a una aseguradora a través de una póliza.

> Entre las bondades que ofrece el negocio de seguros es precisamente que una persona expuesta a sufrir una pérdida, ya sea de su propiedad o quedar obligado financieramente a un tercero por actos u omisiones negligentes, **le transfiere ese riesgo** o pérdida económica de naturaleza contingente a un asegurador que económicamente puede absorber dicha pérdida. No obstante, cuando una persona natural o jurídica se propone utilizar las primas, que ordinariamente les serían pagadas al asegurador, para crear una reserva encaminada a compensar dichas pérdidas, se entiende que el asegurado **ha auto-asegurado o asumido el riesgo él mismo.** (Énfasis nuestro). R. Cruz, *Derecho de Seguros*, San Juan, Publicaciones JTS, 1999, pág. 354.

En ocasiones, las grandes corporaciones y entidades gubernamentales eligen autoasegurarse en lugar de adquirir un seguro. Igualmente, los negocios más pequeños optan por esta alternativa, particularmente si no está disponible la cubierta deseada a un precio favorable. Inclusive los individuos pueden preferir autoasegurarse. De hecho, en otras jurisdicciones la decisión de pactar un deducible u otros mecanismos para reducir el monto de la prima de un seguro, se ha considerado como la voluntad de una persona de autoasegurarse. El autoseguro puede venir acompañado del deseo de financiar las pérdidas, como por ejemplo, si se reservan periódicamente dineros suficientes para cubrir daños anticipados. De otra parte, el autoseguro puede consistir simplemente en la decisión de absorber ciertas pérdidas en la eventualidad de que ocurran daños. *Couch*, *supra*, Sec. 10.1, pág. 10-5.

El uso del autoseguro ha resultado particularmente beneficioso para las municipalidades y otras entidades gubernamentales. Precisa recordar que los autoasegurados mantienen su independencia del mercado tradicional comercial y deciden cómo manejar el riesgo y las controversias asociadas al litigio. Se entiende que este mecanismo redunda en mayor seguridad, menos pérdidas y una mejor administración. Berkely, *supra*, pág. 693.

De manera que, convertirse en un autoasegurado, parcial o totalmente, puede constituir una manera efectiva de manejar los costos de una empresa en la medida que se

ahorra en el pago de comisiones, impuestos, las ganancias de las compañías aseguradoras y gastos administrativos sustanciales asociados con la industria de seguros. M.W. Flory y A. Lui Walsh, *Know thy Self-insurance (and thy Primary and Excess Insurance)*, 36 Tort & Ins. L.J. 1005, 1006 (2001). Además, no tiene que hacerse desembolso alguno hasta que ocurre la pérdida. De este modo, se retienen los intereses acumulados sobre los fondos que hayan reservado para cubrir pérdidas futuras. 1 *New Appleman on Insurance Law Library Edition* Sec. 1.09[2], pág. 1-95 (Rel. 11-9/2014). Véase, además, *Couch*, *supra*, Sec. 10.1, pág. 10-5.

Por otro lado, la desventaja principal de este mecanismo es que el autoasegurado retiene el riesgo de la pérdida y absorbe los costos relacionados con la investigación y el trámite de las reclamaciones. *New Appleman on Insurance Law Library Edition, supra*, Sec. 1.09[2], pág. 1-95. Véase, además, *Couch*, *supra*, Sec. 10.1, pág. 10-5.

En Estados Unidos, el uso del autoseguro aumentó significativamente en la década de los 1980, debido al encarecimiento dramático que experimentaron las primas de los seguros en lo que se denominó "la crisis de los seguros". Flory y Walsh, *supra*, pág. 1006; Goode, *supra*, pág. 1250. Durante esa época, muchas entidades decidieron autoasegurarse, ya fuese porque las cubiertas no estaban disponibles o sus costos resultaban prohibitivos. Goode,

*supra*, pág. 1250.   En las últimas décadas, este mecanismo, en sus diferentes modalidades, se ha convertido en algo cada vez más común en otras jurisdicciones.   Flory y Walsh, *supra*, pág. 1005.   En tiempos recientes han surgido, además, una variedad de alternativas a las prácticas tradicionales de seguro comercial.   *New Appleman on Insurance Law Library Edition*, *supra*, Sec. 1.09[1], pág. 1-95.

### D. Tercero Administrador

Un gran número de entidades ha decidido que, para fines de manejar sus riesgos, el autoseguro le resulta más conveniente que comprar una cubierta.   Sin embargo, muchas de las compañías que optan por el autoseguro carecen de un departamento de reclamación propio y desconocen las particularidades del proceso de reclamaciones.   Así pues, eligen contratar a un Tercero Administrador que se encargue de procesar las reclamaciones que surjan bajo un programa de autoseguro.

El Tercero Administrador es un intermediario que puede asumir ciertas tareas operacionales a nombre de entidades autoaseguradas.   Generalmente, tiene la encomienda de tramitar las reclamaciones y los beneficios de programas de seguros de salud y de vida.   2 *New Appleman on Insurance Law Library Edition*, *supra*, Sec. 15.02[4], pág. 15-18 (Rel. 9-9/2013).   Puede llevar a cabo esta función, en todo o en parte, a nombre de un autoasegurado.   Además, provee los servicios de cobro de primas, inscripción y otras

actividades de naturaleza administrativa. 1 *New Appleman Insurance Law Practice Guide* Sec. 1.11[2], pág. 1-25 (2016). En fin, un Tercero Administrador investiga y ajusta las reclamaciones de, prácticamente, la misma forma en que una compañía o un ajustador independiente lo haría. No obstante, el pago de la reclamación proviene de un programa de autoseguro en lugar de una póliza de seguro. *New Appleman on Insurance Law Library Edition*, *supra*, Sec. 4.03[6], pág. 4-25 (Rel. 13-9/2015).

La figura del Tercero Administrador no aparece reglamentada en nuestro ordenamiento, excepto en el campo de los servicios de salud. A través de la Ley Núm. 203-2008 se insertó el Capítulo 31 al Código de Seguros, 26 LPRA secs. 3101-3108 (2014), mediante el cual se autorizó la negociación colectiva entre las organizaciones de servicios de salud y los proveedores para acordar los términos de sus contratos.[5]

Como parte de la Ley Núm. 203-2008, *supra*, se consignó la siguiente definición del Tercero Administrador:

> Es una organización pública o privada que procesa reclamaciones de proveedores **sin asumir riesgo.** Usualmente son contratados por organizaciones de servicios de salud u otras entidades que se **autoaseguran,** con el propósito de que administren los servicios de: procesamiento de reclamaciones, cobro de primas, contratar proveedores, pago a proveedores y actividades administrativas. (Énfasis nuestro). Art. 31.020(7) del Código de Seguros, 26 LPRA sec. 3102(7) (2014).

---

[5] A tenor de la Ley Núm. 203-2008, 26 LPRA secs. 3101-3108 (2014), la Oficina del Comisionado de Seguros promulgó el Reglamento Núm. 7646 de 23 de diciembre de 2008, conocido como Regla Núm. 91. Allí se establecieron las normas atinentes al proceso de negociación entre estas entidades y los Terceros Administradores.

Posteriormente, hubo un intento fallido de añadir el Capítulo 32 al Código de Seguros con el propósito de regular los contratos de los Terceros Administradores con las aseguradoras y organizaciones de servicio de salud en Puerto Rico. Con ese propósito, el 16 de octubre de 2014, se aprobó en la Cámara de Representantes el P. de la C. 1573.[6] Sin embargo, el proyecto no se validó como ley.

### E. Interpretación de Pólizas de Seguro

El Código de Seguros, 26 LPRA sec. 101 *et seq.* (2014), establece las reglas propias para la interpretación de las pólizas de seguro, las cuales hemos recogido en nuestra jurisprudencia. Véanse, por ejemplo, <u>Viruet *et al.* v. SLG Casiano-Reyes</u>, *supra*; <u>Natal Cruz v. Santiago Negrón *et al.*</u>, *supra*. Entre los principios más destacados, despunta la protección del asegurado. Así pues, en aquellos casos en que surjan dudas en torno a las cláusulas de una póliza, se acogerá la interpretación que más le favorezca. De ser necesario, se recurrirá de manera supletoria a los principios generales de hermenéutica aplicables a los

---

[6]     El Art. 32.010 del P. de la C. 1573 definía esta figura del modo siguiente:

........

   I.    "'Tercero administrador', conocido por sus siglas en inglés como 'TPA', significa una persona que en **representación de un asegurador** administre seguros, sea directa o indirectamente, acepta solicitudes de seguros, cobra primas o realiza ajustes o transige reclamaciones, o realiza cualesquiera otras funciones administrativas u operacionales según contratadas con el asegurador relacionadas a las cubiertas de cualquier tipo de seguro que provea un asegurador a personas o sobre riesgos que residan en Puerto Rico."

........

contratos, según preceptuados en los Arts. 1233 a 1241 del Código Civil, 31 LPRA secs. 3471-3479 (2015). Maderas Tratadas v. Sun Alliance *et al.*, *supra*.

### F. Interpretación de Contratos

La interpretación de los contratos en general se rige por el esquema dispuesto en los Arts. 1233 a 1241 del Código Civil, 31 LPRA secs. 3471-3479 (2015), teniendo presente en todo momento la intención de las partes. VDE Corporation v. R & R Contractors, 180 DPR 21 (2010); Rodríguez *et al.* v. Gómez *et al.*, 156 DPR 307 (2002).

Cónsono con nuestro ordenamiento, primeramente, se examinarán los términos del contrato. De ser claros, se hará valer el sentido literal de lo allí dispuesto. Sin embargo, si lo consignado en el acuerdo aparenta ser contrario a la intención de las partes, prevalecerá esta última. Art. 1233 del Código Civil, 31 LPRA sec. 3471 (2015). Como parte de este proceso de análisis, se examinarán los actos contemporáneos y posteriores al acuerdo con el fin de verificar la intención de las partes al vincularse contractualmente. Art. 1234 del Código Civil, 31 LPRA sec. 3474 (2015). Por último, nuestra normativa ordena que las disposiciones del contrato se interpreten de manera integrada, cónsona con los designios de los contratantes. Art. 1237 del Código Civil, 31 LPRA sec. 3475 (2015).

### G. Sentencia Sumaria

A través del mecanismo de sentencia sumaria dispuesto en la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V (2010), los tribunales están autorizados a disponer parcial o totalmente de litigios civiles en aquellas situaciones en que no exista alguna controversia material de hecho que requiera ventilarse en un juicio plenario. *Rodríguez Méndez et als. v. Laser Eye Surgery Management of PR, Inc. et al.*, 2016 TSPR 121, 195 DPR ___ (2016); *Lugo Montalvo v. Sol Meliá Vacation*, 194 DPR 209 (2015); *Meléndez González et al. v. M. Cuebas*, 193 DPR 100 (2015); *Burgos López et al. v. Condado Plaza*, 193 DPR 1 (2015). De manera que, procede dictar sentencia sumaria cuando no existe un conflicto genuino en torno a hechos materiales y el derecho aplicable así lo permite. *Íd.* Este trámite sumario agiliza el proceso judicial, alivia la carga de los tribunales y ayuda a las partes a obtener un remedio justo, rápido y económico. *Íd.*

## IV. DISCUSIÓN

### A. Tercero Administrador

Además de concluir que los términos del Contrato no eran claros, el Tribunal de Apelaciones destacó que la figura del Tercero Administrador no está reglamentada en nuestro ordenamiento fuera del campo de la salud. Específicamente, advirtió que el tribunal primario no fundamentó las razones para permitirle a un Tercero Administrador manejar fondos públicos sustanciales ante

esta ausencia de normativa. Sobre este particular, indicó lo siguiente:

> En su día, corresponderá al foro primario dilucidar en un juicio plenario si Integrand es una **administradora del auto-seguro** del Municipio, **si procede en derecho**, y pese a que […] el único proyecto de ley sobre este tema no contó con el aval del Senado de Puerto Rico, extender el reconocimiento de dicha figura al ámbito de responsabilidad pública en ausencia de ley positiva o **si Integrand debe responder ante la recurrida en capacidad de aseguradora**. (Énfasis nuestro).

Sin embargo, a falta de reglamentación expresa en torno al acuerdo bajo la consideración del tribunal, correspondía analizar los términos de lo pactado entre las partes a la luz de la autonomía de la voluntad, principio rector en materia de contrato. Andréu Fuentes y otros v. Popular Leasing, 184 DPR 540, 554 (2012); Class v. Vehicle Eqmnt. Leasing Co., 143 DPR 186, 198 (1997); Meyers Bros. v. Gelco, 114 DPR 116, 123 (1983).

Cónsono con esta norma, las partes quedan libres de estipular todas aquellas cláusulas y condiciones que estimen pertinentes a su relación, siempre que éstas no contravengan la ley, la moral o el orden público. Art. 1207 del Código Civil de Puerto Rico, 31 LPRA sec. 3372 (2015). Andréu Fuentes y otros v. Popular Leasing, *supra*; Class v. Vehicle Eqmnt. Leasing Co., *supra*; Meyers Bros. v. Gelco, *supra*.

En lo que respecta a la controversia ante nos, el estado de derecho actual **no** impide que se contrate a entidades como Integrand para realizar labores relacionadas

con el manejo de reclamaciones - **estrictamente** en calidad de **Tercero Administrador** - por el mero hecho de ser aseguradoras autorizadas para emitir pólizas en Puerto Rico. Nuestro ordenamiento guarda silencio sobre este particular y, no vemos razón legítima para vedar esa práctica en el presente recurso. Es decir, a pesar de que la figura del Tercero Administrador no ha sido reglamentada en nuestra jurisdicción, resolvemos que, en el contexto específico del Contrato que da base a este litigio, no existe impedimento legal que inhabilite a Integrand para efectuar este tipo de labor.

En ese sentido, la Ley de Municipios Autónomos específicamente autorizó al Secretario de Hacienda para, a nombre de los municipios, adoptar el mecanismo de autoseguro con el fin de proteger a estas entidades gubernamentales de los riesgos denominados "puros". También le facultó a fijar aquellos términos contractuales que entendiese apropiados para llevar a cabo esta encomienda, incluyendo disponer los "procedimientos a seguir en el **trámite, ajuste y negociación** de reclamaciones". (Énfasis nuestro). Art. 8.011(d) de la Ley de Municipios Autónomos, 21 LPRA sec. 4361(d) (2014). Estas responsabilidades detalladas en la ley son cónsonas con las labores delegadas al Tercero Administrador en escenarios de autoseguro, lo que nos lleva a concluir que el aludido estatuto permite utilizar este tipo de servicio

para atender gestiones concernientes a las reclamaciones instadas en contra de los municipios.

Asimismo, conforme a la documentación que consta en autos, resulta incuestionable que las funciones delegadas a Integrand se ejercieron en calidad de **Tercero Administrador de un fondo de autoseguro** y no como asegurador. Según mencionamos anteriormente, las facultades encomendadas a un Tercero Administrador en materia de autoseguro pueden coincidir, en muchos aspectos, con las labores de una compañía aseguradora en la medida en que se le delega el defender al autoasegurado, así como procesar y transigir las reclamaciones sometidas en contra de éste sin que esto le convierta en un asegurador.

No podemos perder de perspectiva que, como regla general, los autoasegurados carecen del peritaje necesario para procesar las reclamaciones que afectan su capital. Es por ello que, tal como ocurrió en este caso, las entidades autoaseguradas, ya sean públicas o privadas, comúnmente recurren a compañías independientes para que lleven a cabo estas gestiones con el propósito de reducir gastos.

De otra parte, el Tribunal de Apelaciones entendió que la discreción y responsabilidad que conlleva la encomienda de manejar las reclamaciones bajo el Contrato, podían tornar a Integrand en una entidad responsable directamente ante la parte apelada.[7]

---

[7]    Específicamente, el Tribunal de Apelaciones hizo referencia a <u>Wathor v. Mutual Assur. Adm'rs., Inc.</u>, 87 P.3d 559 (Okla. Sup. Ct. 2004) y <u>Cary v. United of Omaha Life Ins. Co.</u>, 68 P.3d 462 (Co. Sup. Ct. 2003). En estos casos, se

Sin embargo, acorde con las alegaciones vertidas en la Demanda, la acción instada en contra de Integrand está predicada **exclusivamente** en el mecanismo de acción directa dispuesto en el Art. 20.030 del Código de Seguros, *supra*. Es decir, se le trae al pleito **únicamente** en calidad de **aseguradora** por alegadamente haber expedido una póliza de seguros que cubre reclamaciones por daños y perjuicios por los cuales el Municipio es llamado a responder. No consta en el caso alegación alguna dirigida contra Integrand en su capacidad de Tercero Administrador. Es decir, en ningún momento se cuestiona la labor de la apelante al defender, procesar y transigir reclamaciones a la luz de los términos del Contrato.

Por lo tanto, no existe fundamento legal para adscribirle responsabilidad a Integrand por sus ejecutorias como Tercero Administrador a tenor de los hechos imputados en la Demanda.

### B. El Autoseguro

El autoseguro tampoco aparece reglamentado taxativamente en Puerto Rico en el contexto del Contrato que nos ocupa. Sin embargo, existe una amplia discusión del concepto en otras jurisdicciones que nos permite analizar esta figura con mayor claridad.

A través del Contrato, se repiten ciertos conceptos básicos que confirman la naturaleza del pacto como uno de

---

debatió la responsabilidad de Terceros Administradores a cargo de planes de salud frente a los beneficiarios del plan **por alegaciones de mala fe en el manejo de las reclamaciones.**

administración de un autoseguro. Primeramente y fundamental a este asunto, se destaca la obligación del Gobierno de pagar la cantidad de $18 millones denominada "*Funding Amount*". Esta exigencia aparece consignada taxativamente entre las cláusulas del Contrato.

El "*Funding Amount*" se encuentra, a su vez, desglosado en dos (2) partidas, a saber: $14.4 millones para el pago de reclamaciones y $3.6 millones para cubrir los gastos de Integrand en tramitarlas.[8] Asimismo se fijó el **límite** máximo de $14.4 millones para el **pago** agregado de **reclamaciones en contra de los municipios por pérdidas cubiertas bajo los términos del Contrato.**[9]

Así pues, no cabe duda de que, a tenor con los términos inequívocos del Contrato, le correspondía al Gobierno el pago total de estos fondos. Este requisito de pago constituyó una obligación esencial del acuerdo, al extremo de que su incumplimiento daba base a la cancelación del Contrato. De manera que, se especificó el derecho de Integrand a rescindir la póliza de no pagarse en su **totalidad** el "*Funding Amount*" en el término de tiempo provisto para ello. (Contrato Sec. A2a, **Ap. 150**).

---

[8] "'*Funding amount*' *the funding amount payable is $18,000,000.00 net of commission which represents the sum of the 'OVERALL AGGREGATE LIMIT FOR ALL INDEMNITY PAYMENTS' of $14,400,000.00 and the 'LOSS ADJUSTMENT EXPENSES AND OTHER EXPENSES' OF $3,600,000.00*". (**Ap. 149**).

[9] "'*OVERALL AGGREGATE LIMIT FOR ALL INDEMNITY PAYMENTS OF $14,400,000.00*' *means the maximum overall aggregate limit to be paid for all indemnity losses that amounts to FOURTEEN MILLION FOUR HUNDRED THOUSAND DOLLARS ($14,400,000.00 includes all amounts paid by INTEGRAND Assurance Company to third parties or reimbursed to you for losses under this policy which includes prejudgment and post judgment interest awarded against INTEGRAND Assurance Company or you)*". (**Ap. 149**).

De igual manera, Integrand tenía que devolver cualquier excedente de los dineros aportados por el Gobierno una vez terminara el Contrato, ya fuese por su expiración o cancelación. En atención a ello, la apelante venía obligada a calcular y a reembolsar al Gobierno el sobrante de los $14.4 millones. (Contrato Secs. A1 y A3, **Ap. 150**).

A base de lo anterior y conforme a los términos relevantes del Contrato, los cuales no están en controversia, **las compensaciones a los reclamantes habrían de pagarse con fondos provenientes del Gobierno y no mediante una póliza expedida por Integrand**. No existe disposición alguna en el Contrato que dé base a concluir lo contrario. De esta manera, **el riesgo** concerniente a los posibles daños por los actos u omisiones negligentes de los municipios **nunca se transfirió a Integrand**. Por el contrario, el riesgo se retuvo entre los municipios, quienes aportaron a un fondo común a través del Departamento de Hacienda para, de este modo, enfrentar posibles reclamaciones futuras.

Una lectura integral del Contrato tampoco nos permite decretar que los $3.6 millones pagaderos a Integrand constituían primas de seguro. Más bien, estos dineros iban dirigidos a compensar a la apelante por sus obligaciones relacionadas al manejo y la transacción de las reclamaciones iniciadas en contra de los municipios en calidad de Tercero Administrador, según contraídas mediante

el Contrato. Es decir, cubrían los gastos de Integrand vinculados a la **investigación, defensa y disposición** de dichas reclamaciones.[10] Una vez agotados los $14.4 millones, cesaba la responsabilidad de Integrand de pagar las reclamaciones, por lo que esta obligación revertía al Gobierno.[11]

Al no estar frente a una póliza de seguros, sino ante un contrato de administración de un autoseguro pactado entre Integrand y el Departamento de Hacienda, corresponde interpretar el acuerdo utilizando las reglas de hermenéutica dispuestas en el Código Civil y no la normativa especial fijada en el Código de Seguros. Por lo tanto, examinamos los términos consignados por las partes en el documento de una manera integral. Únicamente de éstos no resultar claros, habrá que auscultar la intención de las partes.

Notamos que el Tribunal de Apelaciones apoyó su determinación en una serie de estatutos y precedentes judiciales de varias jurisdicciones de los Estados Unidos, según los cuales, bajo ciertas condiciones se ha calificado el autoseguro como una cubierta comercial o se ha

---

[10] "*All expenses incurred by INTEGRAND Assurance Company in the duty to investigate, defend and settle 'claims' or 'suits' as covered under the terms of this Policy-Contract. […] The loss adjustment expenses and other expenses account amounts to THREE MILLION SIX HUNDRED THOUSAND DOLLARS ($3,600,000)*". (**Ap. 149**).

[11] "*[A]fter the OVERALL AGGREGATE LIMIT FOR ALL INDEMNITY OF $14,400,000.00 has been exhausted, Integrand Assurance company will not be responsible for any further indemnity payments under this Policy Contract. In the event that the OVERALL AGGREGATE LIMIT FOR ALL INDEMNITY PAYMENTS OF $14,400,000.00 is exhausted, you will assume the responsibility to make further indemnity payments*". (**Ap. 152**).

considerado que, al adentrarse en esta práctica, se está incursionando en el negocio de seguros (*business of insurance*).**12**

Primeramente, debe quedar claro que la aplicabilidad de esta normativa y jurisprudencia responde a situaciones concretas, muy particulares, que no guardan relación alguna con los hechos presentes en este recurso. Es decir, estos precedentes resultan ajenos a la controversia que nos ocupa. Además, bajo **ninguna** de las contingencias contempladas en estas leyes y casuística, un autoseguro constituido, enteramente por una aportación gubernamental, puede **transformarse** en una **póliza** de seguro de responsabilidad pública que nunca fue emitida por una compañía aseguradora. En otras palabras, si lo que está de por medio es el pago de una reclamación y el resarcimiento correspondiente proviene **exclusivamente** de los dineros aportados por un autoasegurado, no puede imputársele

---

**12**      A pesar de que el autoseguro **no** constituye propiamente un seguro, en ocasiones se ha debatido si estos dos (2) mecanismos deben ser equiparados para ciertos propósitos. En otras palabras, se ha cuestionado si, en circunstancias muy particulares, una parte que no ha comprado un seguro y en efecto, actúa como su propio asegurador, debería ser tratada, para fines legales, de la misma forma que un asegurador comercial y atribuírsele los derechos y las obligaciones de un asegurador. Sin embargo, esta discusión se ha limitado a unos escenarios específicos.

Concretamente, este tema se ha atendido en los siguientes contextos: (1) la cláusula de "otro seguro" (*other insurance clause*), (2) la inmunidad soberana del gobierno, (3) las exenciones a los esquemas de seguro compulsorio, (4) las obligaciones y los deberes en el trámite de las reclamaciones y (5) el derecho a la exención tributaria del pago de primas de seguro. Véase 1 *New Appleman on Insurance Law Library Edition* Sec. 1.09[2], pág. 1-97 (Rel. 11-9/2014); H. Nosowitz, C. Clarke, J.B. Berkeley, *Recent Developments Affecting Self-insurers and Risk Managers*, 41 Tort Trial & Ins. Prac. L.J. 719 (2006); M.W. Flory y A. Lui Walsh, *Know thy Self-insurance (and thy Primary and Excess Insurance)*, 36 Tort & Ins. L.J. 1005 (2001); R.A. Goode, *Note*, *Self-Insurance as Insurance in Liability Policy "Other Insurance" Provisions*, 56 Wash. & Lee L. Rev. 1245 (1999); J.B. Berkely, *Recent Developments in Self-insurance Law*, 33 Tort & Ins. L.J. 693 (1998); E. Hollowell, Annotation, *Self-insurance against Liability as other Insurance within Meaning of Liability Insurance Policy*, 46 ALR4th 707 (1986).

responsabilidad **en calidad de aseguradora** a una entidad que ha actuado meramente como Tercero Administrador de esos fondos.

Repetimos, la reclamación que pesa sobre Integrand está fundamentada **única y exclusivamente** en que alegadamente emitió una póliza de responsabilidad pública a favor del Municipio a tenor del Art. 20.030 del Código de Seguros ("**acción directa**"). Por lo tanto, en este caso resultan improcedentes las variantes jurídicas bajo las cuales se han reputado ciertas prácticas del autoseguro como un seguro.

Advertimos, además, que el Tribunal de Apelaciones indicó en su Sentencia que la transferencia de riesgo de por sí **no** constituye el **único** criterio para determinar si una empresa está o no dedicada al negocio de seguros y citó a Insurance Bd. under Social Ins. Plan v. Muir, 635 F.Supp. 1425 (M.D. Pa. 1986) en apoyo a esta posición. En ese caso, la controversia giraba en torno a las disposiciones de la Ley McCarran-Ferguson, 15 USCA secs. 1011-1015, mediante la cual expresamente se le delegó a los estados de la Unión la facultad de reglamentar el "negocio de seguros" ("*business of insurance*").[13]

A su vez, Insurance Bd. under Social Ins. Plan v. Muir, *supra*, se basó en Union Labor Life Ins. Co. v.

---

[13] A esos efectos, la Ley McCarran-Ferguson, 15 USCA sec. 1012(a) dispone:

"*The **business of insurance**… shall be subject to the laws of the several States which relate to the regulation or taxation of such business*". (Énfasis nuestro).

Pireno, 458 US 119 (1982), una opinión del Tribunal Supremo
de los Estados Unidos donde se establecieron ciertos
factores para identificar si, **para propósitos de la Ley
McCarran-Ferguson**, la práctica en controversia constituye
un **"negocio de seguros"** que permita salvaguardar la
autoridad estatal sobre el asunto. La decisión del máximo
foro judicial federal dispuso que, entre los criterios a
considerar, se evalúa si, conforme a la gestión sujeta al
escrutinio judicial, se transfiere o se extiende el riesgo
del asegurador, si ésta constituye una parte integral de la
relación entre el asegurador y su cliente y si su uso se
limita a entidades en la industria de seguros.[14] Union
Labor Life Ins. Co. v. Pireno, *supra*.

Como puede apreciarse, las expresiones del Tribunal
Supremo federal están suscritas únicamente en función de la
interpretación de la Ley McCarran-Ferguson. Es decir, a
través del análisis se procura precisar si, a tono con las
prácticas en controversia, se entiende que una entidad está
incursionando en el negocio de seguros y, por lo tanto, se
encuentra sujeta únicamente a la reglamentación estatal en
materia de seguros. Nuevamente, los parámetros
establecidos por el foro federal, en consideración a un
estatuto especial, no tienen injerencia con los hechos que

---

[14]    La versión en inglés establece los criterios del siguiente modo:

> *"[T]he practice has the effect of transferring or spreading a
> policyholder's risk; second, whether the practice is an integral
> part of the policy relationship between the insurer and the
> insured; and third, whether the practice is limited to entities
> within the insurance industry".* Union Labor Life Ins. Co. v.
> Pireno, 458 US 119, 129 (1982).

tenemos ante nuestra consideración. Las únicas incidencias relevantes a este recurso surgen del Contrato entre Integrand y el Departamento de Hacienda y se atienden satisfactoriamente por las disposiciones de nuestro Código Civil.

En resumen, en este caso no median hechos en controversia que impidan disponer de la solicitud de sentencia sumaria a favor de Integrand. Tampoco es menester adentrarse en el proceso de indagar la intención de las partes contratantes. Los términos cruciales a la naturaleza del Contrato como uno de autoseguro se encuentran delineados ineludiblemente en sus cláusulas. Independientemente de que algunos de los vocablos allí consignados estén asociados a las pólizas de seguro, en este caso está ausente el requisito cardinal de una cubierta: la transferencia de riesgo.[15] El dinero aportado proviene única y exclusivamente de fondos públicos. De otra parte, las características propias del autoseguro permean todo el Contrato.

Cabe notar que, según mencionamos anteriormente, el Art. 8.011(a)(1) de la Ley de Municipios Autónomos permite el mecanismo de autoseguro y advierte que **no** se equiparará a un seguro. Asimismo, el Comisionado de Seguros certificó

---

[15] El Tribunal de Apelaciones entendió, además, que no procedía dictar sentencia sumaria porque los términos del acuerdo no eran claros y se asemejaban más bien a los de una póliza de seguro. A esos efectos, mencionó que se utilizaron los vocablos "póliza" y "prima" en algunas de las cláusulas del Contrato. Sin embargo, no por ello el Contrato se convierte en una póliza de seguros. Cabe recordar que, según hemos advertido en ocasiones anteriores, el nombre no hace la cosa. Siaca v. Bahía Beach Resort & Golf Club LLC, Interlink Realty, Corp., 2016 TSPR 11, esc. 75, 194 DPR ____ (2016); Mun. Rincón v. Velázquez Muñiz y otros, 192 DPR 989 (2015).

que el Contrato en cuestión **no** constituía un contrato de seguros. Cónsono con nuestro dictamen, fundamentó su opinión de la siguiente forma:

> Habiendo examinado las características del referido Programa [Programa de Responsabilidad Civil de los Municipios de Puerto Rico], es la posición de esta Oficina que el mismo constituye un contrato de administración y no un contrato de seguros. Lo anterior obedece a que el referido asegurador no recibe una transferencia de los riesgos, sino que realiza funciones de las que se conocen en la industria de seguros como las de un Tercero Administrador para un Programa de Autoseguro. (**Ap. 202**).

Erró, por lo tanto, el Tribunal de Apelaciones al determinar que existía la posibilidad de que, en este caso, el autoseguro pudiese constituir una cubierta de responsabilidad pública a favor del Municipio.

Habida cuenta de que en esta ocasión Integrand no emitió una póliza de seguro y la reclamación que nos ocupa descansa **exclusivamente** en el mecanismo de acción directa dispuesto en nuestro Código de Seguros, no existe base legal para retener a Integrand como parte en el litigio.

## V. CONCLUSIÓN

A base de lo anterior, se revoca la Sentencia del Tribunal de Apelaciones de 9 de noviembre de 2015 y se desestima la reclamación instada por la parte apelada en contra de Integrand.

Se dictará Sentencia de conformidad.

ROBERTO FELIBERTI CINTRÓN
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Bonnie Savary Leguillow *et al.*

    Apeladas

       v.                AC-2016-0033      Apelación

Municipio de Fajardo;
Integrand Assurance Company

    Apelantes


SENTENCIA

En San Juan, Puerto Rico, a 18 de agosto de 2017.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, se revoca la Sentencia del Tribunal de Apelaciones de 9 de noviembre de 2015 y se desestima la reclamación instada por Bonnie Savary Leguillow, Joannix Ochart y Josefina Leguillow en contra de Integrand Assurance Company.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal Supremo, Interina. La Juez Asociada señora Rodríguez Rodríguez concurre con el resultado sin opinión escrita.


Sonnya Isabel Ramos Zeno
Secretaria del Tribunal Supremo, Interina